**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **CECILENE KREBS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:02-CV-0251-BH** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the District Court's *Order*, filed March 5, 2003, and the consent of the parties, this matter has been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). Before the Court are *Brief for Plaintiff*, filed April 29, 2003, and *Defendant's Brief and Response to Brief for Plaintiff*, filed May 29, 2003. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned is of the opinion that the final decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[1]

### A.     Procedural History

Cecilene Krebs ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits.

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Plaintiff filed an application for disability benefits under Title II of the Social Security Act on September 16, 1999.  (Tr. at 51.)  Plaintiff claimed she was disabled due to: (1) a neck injury and (2) lymphedema in both legs.  (Tr. at 43.)  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 26, 28.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 29.)  A hearing, at which Plaintiff personally appeared, testified, and represented herself, was held on October 31, 2000.  (Tr. at 136.)  On January 17, 2001, the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 20.)  The Appeals Council denied Plaintiff's request for review.  (Tr. at 6.)  Plaintiff then brought this timely appeal to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

      1.      <u>Age, Education, and Work Experience</u>

Plaintiff was born on April 24, 1948.  (Tr. at 38.)  She attained a high school education by means of a GED and attended college for one year.  She also obtained a license as a cosmetology instructor.  (Tr. at 49.)  Her past relevant work experience includes employment as a hair stylist, utilities clerk, medical records clerk, and bank teller.  (Tr. at 44.)

      2.      <u>Medical Evidence</u>

The relevant medical record begins with the records of Dr. Layne Collums, who has been Plaintiff's family physician since at least February 15, 1996.  (Tr. at 129.)  On that date, Dr. Collums noted "chronic lymphedema" in his visit sheet notes.  *Id.*  Aside from this note, there is no indication of lymphedema or any other pain throughout the next six visits with Dr. Collums through April 28, 1998.  (Tr. at 129, 126.)

Plaintiff saw David M. Pogue, M.D. on September 16, 1997 for an electrocardiogram because of "[l]eft anterior axillary pain with numbness in the left arm, approximately lasting 30 to 40 minutes[.]"  (Tr. at 127.)   After Plaintiff's "probable normal Bruce maximal exercise electrocardiogram," among other findings, Dr. Pogue found "[n]o ST-T wave changes consistent with ischemia."  *Id.*   He went on to state that "[t]he patient will be watched carefully for recurrence of anything that would suggest deep vein thrombophlebitis[.]" *Id.*

On January 25, 1999, Plaintiff complained of neck and shoulder problems, which caused headaches.  On this visit, Dr. Collums made note of a need for a breast reduction, which he referred to as a possible cause of pressure on the neck and shoulder.   (Tr. at 114,116.) Additionally, he made a note of chronic edema in the legs from phlebitis.  (Tr. at 114.)

On February 8, 1999, Plaintiff complained of a pain in her left axilla, left anterior chest, and the left arm similar to the pain she had previously experienced in 1997, when she was examined by Dr. Pogue.  (Tr. at 114.)  On the same date, Dr. Collums also mentioned an MRI of the C-Spine and left shoulder and an x-ray of the left shoulder.  *Id.*  Dr. Collums also made a note about a possible appointment with a neurological surgeon, Dr. Sampson [sic].  *Id.*

Plaintiff was referred to Richard A. Redd, M.D., of the Radiology Associates of Wichita Falls, P.A., to have a MRI of the cervical spine.  (Tr. at 119.)  On February 11, 1999, Dr. Redd found that 1) there was a "left paracentral disc protrusion C5-6" and 2) there was "bony spondylosis on the left at C4-5 without central or foraminal narrowing."  *Id.*

On March 2, 1999, Plaintiff saw neurological surgeon Duke Samson, M.D., who was a professor and chairman of the University of Texas Southwestern Medical Center at Dallas Department of Neurological Surgery.  (Tr. at 89.)  Dr. Samson's clinic note described Plaintiff's

difficulty with pain in her neck that initially began in December 1998. *Id.* The pain, which "radiated into her left arm and shoulder and is associated with some tingling in the triceps," was constant over a two month period. *Id.* Plaintiff alleged that this was a recurrence of a previous injury. *Id.* Additionally, Dr. Samson noted that Plaintiff felt some sensory loss in her fingers, complains of numbness and tingling in her face, and had "some unusual sensation in the left side of her neck." *Id.* Dr. Samson recommended that Plaintiff undergo an anterior cervical discectomy and iliac crest bone fusion. *Id.*

On March 24, 1999, Plaintiff was admitted to the hospital for an anterior cervical discectomy and fusion surgery. (Tr. at 77.) Specifically, the surgery was performed on the C5-6 vertebrae by Dr. Samson. *Id.* Dr. Samson noted that Plaintiff had a long history of neck pain and, over the last four months, she had been experiencing increased pain in her neck and left shoulder. *Id.* Additionally, she had developed numbness and tingling in the left arm and in the last two fingers of her hand. *Id.* Dr. Samson also indicated that Plaintiff's imaging studies demonstrated the presence of congenital fusion at C3-4. (Tr. at 80.) Mary A. Mullican, M.D., from the Department of Radiology at Zale Lipshy University Hospital, again noted the congenital blocked vertebrae at C3-4 on her findings and impressions made shortly after the surgery. (Tr. at 83-84.)

Following the surgery, on April 20, 1999, Dr. Samson noted that Plaintiff's "radiating arm pain [had] resolved," but that "she [was] still bothered by neck pain and tightness in her trapezius..." (Tr. at 90.) At that time, Dr. Samson instructed her not to lift more than 15 lbs. *Id.* On the following visit on May 25, 1999, Dr. Samson again noted that Plaintiff still complained of neck stiffness and tightness despite a "complete resolution of her radicular symptoms

involving the left upper extremity." (Tr. at 91.) However, her symptoms were gradually improving. *Id.* Dr. Samson noted that the C-spine showed "good position of the bone graft and adequate cervical alignment." *Id.* He also noted that Plaintiff was progressively increasing her activities. *Id.* At the same clinic on the same day, Michael B. Horowitz, M.D., an assistant professor at the University of Texas Southwestern Medical Center at Dallas Department of Neurological Surgery, also noted that the "x-ray today look[ed] excellent." (Tr. at 92.) Plaintiff was told that she could return to her normal activities, with the exception that she was to refrain from heavy lifting for one month. *Id.*

In a follow-up appointment to Plaintiff's neck surgery on August 10, 1999, Dr. Samson noted that Plaintiff stated that "her symptoms of neck and left upper extremity pain and paresthesias [were] completely resolved." (Tr. at 95.) She was "moving her left upper extremities and her hands without weakness." *Id.* However, on that same day, it was also noted that Plaintiff stated that she still had a tightness in her trapezius and a pain in her neck that would result in headaches. *Id.* Additionally, Dr. Samson reported that the x-ray taken on the same date showed "adequate position and fusion of the bone graft at the C5-6 level." *Id.* He also noted a congenital fusion at level C3-4. *Id.* Dr. Samson did not require a follow-up clinic visit after this date and instructed Plaintiff to call the clinic if she experienced any complications. *Id.*

On September 14, 1999, Plaintiff saw Dr. Collums again to discuss the discectomy performed by Dr. Samson and to further discuss the breast reduction. (Tr. at 116.) Dr. Collums noted that Plaintiff still experienced numbness in the shoulder. *Id.* As previously explained, Dr. Collums noted that the weight of the breast put pressure on the neck and shoulder and that a breast reduction was needed. *Id.* Additionally, Dr. Collums appears to have suggested that

Plaintiff apply for disability due to the neck disease, phlebitis with pulmonary emboli, and chronic lymphedema.  *Id.*

On January 10, 2000[2], Plaintiff complained that she "continue[d] to have pain in the left shoulder and both wrists."  (Tr. at 115.)   Additionally, Plaintiff claimed she got a pounding headache when she bent over, her neck tightened when she became tired, she had difficulty breathing when she became tired, and she continued to have swelling and pain from the lymphedema in her legs.   *Id.*   Plaintiff requested a letter written by Dr. Collums for Social Security Disability.  *Id.*  Dr. Collums noted a decrease in the range of motion of the neck, spasms in the upper back, numbness and tingling in the fourth and fifth fingers of the left hand, pain in the neck and left shoulder, 3+ edema in the right leg, 2+ edema in the left leg, and, secondary to Plaintiff's disc disease, there was neck and nerve root irritation and lymphedema.  *Id.*  On the same visit, Dr. Collums noted that Plaintiff had probable cellulitis, was unable to work generally or as a hair dresser, was considered disabled, and was unable to sit due the lymphedema.  *Id.*  A venous Doppler study and a chest film were suggested by the doctor.  *Id.*

In two subsequent visits on January 11, 2000 and January 14, 2000, Plaintiff returned to Dr. Collums for the tests and the results.  (Tr. at 113.)   The venous Doppler test came back "normal."  *Id.*  Dr. Collums suggested that the Plaintiff file for disability due to her cervical disc disease and lymphedema.  (Tr. at 113, 130.)

Dr. Collums wrote a letter on May 25, 2000 regarding Plaintiff's medical condition and history.  (Tr. at 130.)  Dr. Collums stated that Plaintiff was a

---

[2]The record indicates that Plaintiff saw Dr. Collums again on January 10, 1999.  (Tr. at 115.)  However, from the noted age of the Plaintiff as 51, it appears that the correct and intended date of the visit is January 10, 2000.

> 52 year old female with a history of severe lymphadema [sic] in both legs since the age of 10.  In May of 1987, she had a pulmonary emboli due to deep vein thrombosis.  In February of 1988, she developed phlebitis and cellulitis of the left leg.  In May of 1988, she was admitted to the hospital due to phlebitis, lymphadema [sic] and deep vein throbosis [sic].  She wears individual fitted custom made stockings for the lymphadema [sic].
>
> On February 11, 1999, she had an MRI which showed a left paracentral disc herniation at C5-6....
>
> Because of the deep vein thrombosis, chronic severe debilitating lympadema [sic], pulmonary emboli, and residual C-spine disease, Mrs. Krebs is totally disabled.  She cannot sit more than 2 hours.  She stands less than 1 hour due to the lymphadema [sic].  She has to elevate her legs to abate the edema.  She is restricted in neck motion and cannot do her usual beauty shop work.  She also has hyperlipidemia.  This patient's edema has in the past resulted in deep vein thrombosis and cellulitis that has been life-threatening and it is imperative that she keep the edema away or it would result in possible complications that could lead to death.  *Id.*

Dr. Collums noted that the "patient's subjective symptoms that essentially solidified [the] situation[]" were included with the letter, but such enclosure is not included in the record.  *Id.*

Neurologist Dr. D. R. Bartel wrote a letter on October 4, 2000 that also described Plaintiff's medical history and current status concerning her neck and lymphedema.  (Tr. at 133.) Dr. Bartel stated that Plaintiff "ha[d] history of Klippel-Feil anomaly which is a birth defect. Because of this she has had advanced premature cervical disc disease."  *Id.*  Additionally Dr. Bartel stated that Plaintiff had a "ruptured disc at C4-5 with some degree of myelopathy." *Id.*  As a result, Plaintiff felt "hand numbness and loss of coordination and strength in the hands especially when working above shoulder level."  *Id.*  According to Dr. Bartel, due to the Klippel-Feil anomaly, Plaintiff also demonstrated "evidence of vertebral artery insufficiency" which created "some degree of vertebral basilar insufficiency."  *Id.*  Moreover, Dr. Bartel stated that Plaintiff "ha[d] evidence of brain stem transient ischemic attacks from this condition[]" which was also aggravated from use of the arms above shoulder level.  *Id.*  With regard to Plaintiff's

work ability, Dr. Bartel stated that "she [was] unable to work in [the hair dressing] capacity.  She [was] unable to work in any job requiring lifting, bending, fine finger manipulation, or carrying more than 20 pounds.  She could perform sedentary activity if she did not have to use her arms." *Id.*

Dr. Bartel addressed Plaintiff's lymphedema: "She also has chronic lymphedema affecting both legs that require support hose.  Prolonged sitting aggravates edema and causes pain and weakness in her legs.  These [sic] means that sedentary activity more than about two or three hours would be prohibited as well."  *Id.*  In conclusion, Dr. Bartel stated that he did not think that Plaintiff would "make a meaningful recovery to return to work" in the near future and that "she is disabled form [sic] gainful employment."[3]  *Id.*

4.   Hearing Testimony

At the hearing of October 31, 2000, Plaintiff was not represented by counsel.  (Tr. 138.) The ALJ heard testimony from Plaintiff; Clifton King, Vocational Expert ("VE"); Dale Thomas, sister; and Ken Krebs, husband.  (Tr. 136.)

Plaintiff testified that she was 52 years old at the time of the hearing, was married with three daughters, had obtained a GED, graduated from cosmetology school, and later earned an instructor license in that field.  (Tr. at 145-47.)  However, she had never worked as an instructor. (Tr. at 151.)

Plaintiff stated that in December 1998, she began having a lot of trouble with her left shoulder and arm.  (Tr. at 149.)  She stated that she had trouble grasping and keeping control of

---

[3] However, it should be noted that the record does not include treatment notes or test results pertaining to any examination or treatment of Plaintiff by Dr. Bartel.

her comb and scissors.  *Id.*  At about the same time she got a "crick" in her neck that remained

there until her surgery in March 1999.  *Id.*  Plaintiff described her surgery as a discectomy

concerning C5-6 that resulted in a two to three month hospital stay.[4]  (Tr. at 150.)  Plaintiff stated

that after surgery she saw a doctor every two weeks but did not receive any physical therapy.  *Id.*

She testified that her doctor said the surgery was a success and that the pain would go away and

all of her feeling in her left arm and hand would come back.  (Tr. at 150.)  However, she stated

that the pain did not go away and her hand and arm were still tingly, numb, and achy.  (Tr. at

150-51.)

Plaintiff then discussed her work history and the medical problems she experienced doing

specific types of jobs.  (Tr. at 151-156.)  Plaintiff testified that she was a utilities clerk (Tr. at

152) and a medical records keeper.  (Tr. at 153.)  She stated that she had to quit the medical

record keeping job because she "had a reaction with [her] legs from sitting so much."  (Tr. at

154.)  Additionally, Plaintiff testified that she worked as a bank teller.  (Tr. at 154.)  However,

she also stated that the long sitting that the teller position required, caused her to start "having the

cellulitis problem, which is an infection of the tissue."  (Tr. at 156.)  After being a bank teller she

went back to being a hair stylist although the job had previously resulted in her legs swelling and

aching, thus requiring her to elevate them.  (Tr. at 155-56.)

Plaintiff agreed with the ALJ that the focus of her claim was on her shoulders, arms,

hand, and the lymphedema of the legs.  (Tr. at 157.)  The ALJ proceeded to ask about the

---

[4] Although irrelevant to the issues in this case, there is a discrepancy in the amount of time Plaintiff spent in the hospital.  Plaintiff later agreed that she only stayed in the hospital for two to three days.  (Tr. at 167.)

Plaintiff's limitations of daily life activities.  (Tr. at 158.)  Plaintiff testified that her husband was a pilot with no set definite hours; thus, he did not come home at the same time every night.  (Tr. at 158-59.)  She testified that she got up at about 7:30 a.m. or 8:00 a.m., and that she could take care of her own personal hygiene, could use the restroom by herself, could dress herself, and could make her own breakfast.  (Tr. at 159.)  She stated that she took a muscle relaxer (Flexeril), an anti-inflamatory (Celebrex), Lasix for her edema, hormones, and vitamins A, C, and E.  (Tr. at 161.)  She further stated that these medications did not have an adverse affect on her, and she noted that the Celebrex "ha[d] not upset [her] ulcer[.]" *Id.*

Plaintiff testified that after taking her medication she watched television and did "[n]ot really" do any housework.  *Id.*  When asked by the ALJ, Plaintiff stated that she could load and unload the dishwasher, could do the laundry for her and her husband, and could make the beds and straighten up the bedroom.  *Id.*  However, in response to the ALJ's question, Plaintiff stated that she could not vacuum and sweep, so her husband did both.  (Tr. at 162.)  Additionally, in response to the ALJ's questions, Plaintiff testified that she could take out small bags of trash, she attended church (although she had to elevate her legs), she had a driver's license, and she continued to drive (although her driving was limited because she had to get out once every hour to walk around for five or ten minutes).  (Tr. at 163.)  Plaintiff answered that she also had to get up and move around if she sat for a long period of time in addition to elevating her legs.  (Tr. at 162-63.)  Additionally, in response to the ALJ's questions, Plaintiff stated that she went grocery shopping with her husband or someone else most of the time.  (Tr. at 163.)  She stated that she pushed the cart and that she could not go shopping for very long.  *Id.*  She said it took an hour to

drive to the store and she could only shop for 35 or 45 minutes and then she had to go home. *Id.*
The ALJ estimated this round trip to be about three hours and Plaintiff agreed. (Tr. at 164.)

When the ALJ asked about Plaintiff's hobbies, Plaintiff stated that she could not read
because she could not get comfortable or hold the book up because her arm went to sleep. (Tr. at
164.) Plaintiff also agreed that she watched television most of the day and stated that she "just
messe[d] around[.]" *Id.*

When asked about her lifting, carrying, and distance walking ability, Plaintiff answered
that she could lift one gallon of milk, but not two, and she could probably walk around a track
once, but could not climb stairs after that. (Tr. at 165.) In a series of questions about her
medical condition, Plaintiff stated that she could still use her left hand, such as to open a door,
but could not use it for very long, nor could she cut her husband's hair anymore. (Tr. at 166.)
Additionally, she said it would be a fair representation to say that her left hand tingled and felt
numb. *Id.* She added that there was a burning sensation in her left hand, shoulder, and neck. *Id.*
She also stated that her right hand did not tingle, but her right shoulder did hurt. (Tr. at 167.)

In questions about her surgery, Plaintiff agreed that she was in the hospital for two to
three days[5] and did not have physical therapy afterwards. *Id.* She also stated that her surgeon
stated that he was sorry and did not know what else to tell her regarding the tingling sensation.
(Tr. at 168.) She also stated that one of the surgeon's associates stated that she would normally
be limited on looking up and down. *Id.* When asked about the treatment she received for the
edema in her legs, Plaintiff stated that she did not see a doctor on a regular basis and had not
been hospitalized within the past year. *Id.* She further stated that she had the condition since she

---

[5] See footnote 4.

11

was 10 and learned to control it by wearing strong support hose, keeping her legs elevated, and taking Lasix.  *Id.*   When asked how often she saw a doctor, Plaintiff replied that she saw a doctor as needed.  (Tr. at 168-69.)  She stated that she saw a neurosurgeon, a neurologist, and a medical doctor several times.  *Id.*

Plaintiff's sister, Dale Thomas, testified to "emphasize" the testimony of Plaintiff.  She highlighted that Plaintiff had to elevate her legs "above heart level for about 15 minutes at least every two hours."  (Tr. at 170-71.)  She stated that not doing this would result in cellulitis.  (Tr. at 170.)  This witness testified that Plaintiff would take time to elevate her legs when she was a hair stylist.  *Id.*  According to this witness, Plaintiff had to quit her work as a hair stylist when the problem developed in her neck.  *Id.*  The witness reminded the ALJ that Plaintiff had surgery and that she additionally had a new ruptured disc, which she alleged that Dr. Bartel had explained to in his letter to the ALJ.  (Tr. at 172.)  The witness concluded by stating that Plaintiff was "not a person that ha[d] just gone out to seek disability benefits[,]" but was a person that had only given up after trying to "regain full control" over many years.  *Id.*

Additionally, Plaintiff's husband testified that when Plaintiff had problems with her edema, her legs turned "beet red," she got a high fever, and as a result, she had to go to the hospital to be treated with intravenous antibiotics.  (Tr. at 173.)  The witness stated that the last time this happened was in the early 1990's.  *Id.*  Additionally, the witness stated that Plaintiff would get upset when she could not do something such as get "a bowl out of a cabinet."  *Id.*

The ALJ asked the VE to identify Plaintiff's transferable skills.  (Tr. at 176.)  The VE answered that bookkeeping, utilization of the computer, office machinery, customer service, exchange of information, phone skills, and record keeping were the transferable skills.  *Id.*  He

stated that the transferability of any of the skills with vocational adjustment would be "moderate to [] limited." *Id.*

The VE responded to a hypothetical question which assumed an individual of Plaintiff's age, education, and work experience who was limited to occasional lifting and carrying of objects no more than 20 pounds, and who could frequently lift or carry objects up to ten pounds. (Tr. at 177.)  The individual could stand and/or walk with normal breaks for four hours in an eight hour work day, but could stand for a maximum of one hour "whereby she would then have to sit down or alter her position." *Id.*  In addition, the individual could sit with normal breaks for a total of six hours in an eight hour work day, but maximum sitting would be two hours with alternate sitting and standing positions.  (Tr. at 177-78.)  Non-exertional limitations included occasional ramps and stairs, but never ladders, ropes, and scaffolds, and the individual could stoop and crouch occasionally.  (Tr. at 178.)  The hypothetical question also stated that the individual was limited in her non-dominant left hand fine manipulation and had to avoid exposure to constant vibrations.  *Id.*  The individual "experience[d] a moderate level of pain and discomfort affecting her ability to work in a competitive environment." *Id.*  Also, a tingling sensation in the left hand remain[ed] throughout the day.  *Id.*

The VE testified that this hypothetical person could not perform any of Plaintiff's past relevant work; however, this individual could perform a transferable job as an appointment clerk, but not a check cashier and probably not a credit card clerk.  *Id.*  The VE additionally testified that this hypothetical individual could perform other work in the regional or national economy at the unskilled level.  (Tr. at 178-79.)  These jobs included the sedentary, unskilled jobs of appointment clerk, final assembler of optical goods, suture winder, and stuffer.  (Tr. at 179.)

At the conclusion of the VE testimony, the ALJ asked Plaintiff if she had any other questions for the VE. *Id.* Plaintiff replied that she heard someone say something about her computer skills, and she said that she could not look at a computer screen because it would hurt her neck to look through her bi-focals at the screen. *Id.*

**C.     ALJ's Findings**

The ALJ issued his decision denying benefits on January 17, 2001. (Tr. at 12.) In his findings, the ALJ found that Plaintiff had degenerative disc disease of the cervical spine and lymphedema, which were ""severe" within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. at 14.) The ALJ found that Plaintiff had the residual functioning capacity ("RFC") to perform no more than "light" work, "reduced by no standing or walking for more than 1 hour at a time and for more than 4 hours in an 8-hour workday" and no sitting "for more than 2 hours at one time and for more than 6 hours in an 8-hour workday[.]" (Tr. at 15.) In addition, Plaintiff could only occasionally climb ladders, ropes, and scaffolds, or stoop or crouch. *Id.* Also, Plaintiff should avoid "concentrated exposure to environments with vibrations." *Id.* The ALJ described light work as "involv[ing] lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds." *Id.*

The ALJ based his RFC finding on multiple factors. First, Plaintiff had a medical history of cervical surgery, "without evidence of recurrent disc herniation." In addition, the ALJ considered the level of required treatment Plaintiff received, which only included medical therapy since the surgery in 1999. *Id.* His finding was also based on Plaintiff's testimony that she could "take care of her own personal needs, prepare light meals, load and unload her

dishwasher, make her bed, do laundry, take out small bags of trash, go grocery shopping, shop in Wal-Mart for as long as 45 minutes, [] attend church," work on a computer, and walk around the track one time.  (Tr. at 15-16.)  He also noted that Plaintiff stated that "she must stand up and move around for 5-10 minutes after sitting for one hour due to the swelling in her legs."  (Tr. at 16.)

The ALJ considered the medical opinions of Dr. Collums and Dr. Bartel.  *Id*.  Addressing Dr. Collums' medical opinion, the ALJ found it "credible only to the extent it [was] consistent with the residual functional capacity determination set forth above, i.e., no walking for more than 1 hour at one time and no sitting for more than 2 hours at one time."  *Id*.  In so doing, the ALJ stated that the "medical opinion [was] based, in part, on medical conditions that were successfully treated over 10 years ago," and "Dr. Collums assessment that the claimant [could not] work due to 'chronic severe debilitating lymphedema' [was] inconsistent with the claimant's own testimony regarding her activities of daily living."  *Id*.  The ALJ also found Dr. Bartel's medical opinion letter to be "credible only to the extent it [was] consistent with the residual functioning capacity determination set forth above."  *Id*.  The ALJ explained that he could not find "evidence regarding transient ischemic attacks," and "Dr. Bartel's assessment is inconsistent with the claimant's daily activities."  *Id.*

The ALJ further gave "little evidentiary weight" to Plaintiff's sister and husband because there was no evidence that Plaintiff had gone to the hospital for lymphedema within the period at issue.  *Id*.  In addition, their testimony was inconsistent with Plaintiff's own testimony regarding her daily life activities.  *Id.*  The ALJ stated that he gave Plaintiff's subjective complaints "full consideration, both individually and in combination."  *Id.*  As a result, he found that Plaintiff's

complaints of severe neck pain and difficulties using her left hand were not supported by any evidence of the development of a "recurrent disk herniation of the cervical spine." *Id.* Moreover, the ALJ found that Plaintiff's ability to do daily activities was "inconsistent with severe, disabling pain." *Id.*   Although the ALJ found that Plaintiff "[was] afflicted with symptoms from a variety of sources, to include mild to moderate chronic pain, which [were] sufficiently severe as to be noticeable to her at all times," he found that Plaintiff would "be able to remain attentive and responsive in a work setting[.]"  (Tr. at 17.)  Therefore, the ALJ also found Plaintiff's testimony to be credible only the extent it was consistent with the RFC of light work. *Id.*

After determining the Plaintiff's RFC, the ALJ found that Plaintiff could not perform her past relevant work. *Id.*  However, based on Plaintiff's age, education, and past work experience, the ALJ found that Plaintiff had transferable skills, including record-keeping skills, computer skills, office machine skills, customer service skills, and telephone skills.  (Tr. at 18.) Furthermore, based on the testimony of the VE, the ALJ found that Plaintiff was capable of working the sedentary jobs listed by the VE, which included appointment clerk, final assembler of optical goods, suture winder, and stuffer. *Id.*  In conclusion, the ALJ found that "the claimant retain[ed] the capacity for work that exists in significant numbers in the national economy and [was] not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(f))." *Id.*

## II. ANALYSIS

**A.    Legal Standards**

1.    <u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-344 (5th Cir. 1988).

2.    <u>Disability Determination</u>

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §

423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a

claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.   The analysis terminates if the Commissioner determines at any point

during the first four steps that the claimant is disabled or is not disabled.   *Id*.   Once the claimant

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step

five to show that there is other gainful employment available in the national economy that the

claimant is capable of performing.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).   This

burden may be satisfied either by reference to the Medical-Vocational Guidelines of the

regulations or by expert vocational testimony or other similar evidence.   *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the

five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58

(5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents the following issues for review:

(1)      Whether the ALJ failed to support the determination of Plaintiff's RFC with substantial evidence.

(1.1)    Whether the ALJ failed to fully consider Plaintiff's subjective complaints in determining the RFC.[6]

(1.2)    Whether the ALJ misinterpreted/misstated Plaintiff's testimony causing prejudice to Plaintiff.[7]

(2)      Whether the ALJ failed to fulfill his heightened duty to fully and fairly develop the record causing prejudice to Plaintiff.

(3)      Whether the ALJ failed to properly consider the opinion of Plaintiff's treating physician.

**C.      Issue One:  Failure to Support RFC Finding with Substantial Evidence**

Plaintiff contends that substantial evidence does not support the ALJ's findings that she

retained the residual functional capacity to perform light work and that she is not disabled.  (P.'s

Br. at 10.)  In particular, Plaintiff asserts that the ALJ "ignored the medical and lay evidence

showing that [Plaintiff] had a restricted neck motion."  (P.'s Br. at 13.)  Plaintiff also asserts that

the ALJ failed to support his "implicit finding that Plaintiff either did not need to elevate her

---

[6] Although this issue was not expressly listed as a basis for reversal, it was raised and briefed in the discussion of Issue One of Plaintiff's *Brief.  See Brief* at 12-15.  The Court therefore addresses it.

[7] This issue also was not expressly listed as a basis for reversal but was raised and briefed in Plaintiff's discussion of Issue One, and the Court considers it as well.  *See* P.'s Br. at 12-13.

legs, or that a need to do so was vocationally or functionally insignificant." (P.'s Br. at 14.)

An individual's RFC is the most he or she can still do despite recognized limitations.  20 C.F.R. § 404.1545.  "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p.[8] An ALJ may consider an individual to have no limitation or restriction with respect to a functional capacity when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction.  *Id*.  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  *Id*.  Substantial evidence does not support an ALJ's assessment of an individual's RFC when the RFC does not incorporate nonexertional impairments supported by evidence in the record.  *Robinson v. Barnhart*, 248 F. Supp. 2d 607, 623 (S.D. Tex. 2003).  In addition, an ALJ's hypothetical question must reasonably incorporate all of the claimant's disabilities recognized by the ALJ, and the claimant must have the opportunity to correct any deficiencies in the hypothetical question.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  However, the ALJ only needs to incorporate into the hypothetical question pain limitations that the ALJ finds supported by the record.  *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

First, the Court will address whether, in his determination of the RFC, the ALJ considered the evidence regarding Plaintiff's neck problems.  Second, the Court will address

---

[8] Social Security Rulings are binding on the administration, and the agency must follow its own procedure, "even where the internal procedures are more rigorous than otherwise would be required."  *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (collecting cases).  "Should an agency in its proceedings violate its rules and prejudice result, the proceedings are tainted and any actions resulting from the proceeding cannot stand."  *Id*.

whether, in his determination of the RFC, the ALJ properly considered the evidence regarding Plaintiff's lymphedema and the need to elevate her legs.

    1.    <u>Neck</u>

Plaintiff argues that the ALJ "effectively ignored the medical and lay evidence showing that she had restricted neck motion."  (P.'s Br. at 13.)  Plaintiff claims that the ALJ's statement that "[t]here [was] no evidence [of] recurrent disc herniation of the cervical spine" is inaccurate because Dr. Bartel's letter "specifically states that Plaintiff 'has a ruptured disc at C4-5.'"  (P.'s Br. at 12.)  Furthermore, although Plaintiff admits that the "<u>Dictionary of Occupational Titles</u> does not state the extent to which the neck motion is required for jobs," she points out that SSR 83-14 states "…at *all* exertional levels, a person must have certain use of the arms *and head* to grasp, hold, turn, raise, and lower objects."  (emphasis added) (P.'s Br. at 13.)

In the case at bar, the ALJ recognized that the medical evidence showed that Plaintiff had degenerative disc disease that caused her to have a discectomy in March 1999.  (Tr. at 14.)  The ALJ also recognized that even though the Plaintiff's pain was "completely resolved" after her surgery, and x-rays showed "adequate position and fusion of the bone graft at the C5-6 level," there was also a "congenital fusion at the C3-4 level."  *Id.*  The ALJ took into account that Plaintiff experienced some headaches, but could relieve them by lying down and resting.  *Id*. Moreover, the ALJ considered that Plaintiff "reported a recurrence of neck pain, left shoulder pain, and tingling and numbness in her left hand."  Id.  The ALJ also recognized that Dr. Collums stated that claimant "was restricted in neck motion."  (Tr. at 15.)  Restricted neck motion was also recognized by the ALJ, in his consideration of the physical examination in January 2000 that showed a "reduced range of motion of the neck."  (Tr. at 14.)  Additionally,

the ALJ plainly stated that Plaintiff suffers from pain and "symptoms from a variety of sources, to include mild to moderate chronic pain, which are sufficiently severe as to be noticeable to her at all times."  (Tr. at 17.)

It is clear from the record that the ALJ did not ignore Plaintiff's restricted neck motion. The ALJ recognized all existing medical evidence regarding Plaintiff's neck.  However, there is no evidence in the record indicating that Plaintiff's reduced range of motion of the neck was so severe as to limit her ability to perform work related activities.  Based on all of the relevant medical evidence in the record, it appears that the ALJ found that such a neck restriction was not sufficient, alone, to lessen Plaintiff's RFC or find Plaintiff to be disabled.

Additionally, as Plaintiff points out, it is unclear how much neck motion is even actually necessary for the unskilled, sedentary jobs that the VE testified that she could do.  Plaintiff misstated SSR 83-14, which actually says that "at all exertional levels, a person must have certain use of the arms *and hands* to grasp, hold, turn, raise, and lower objects." (emphasis added) (*see* P's Br. at 13.)  Thus, Plaintiff has failed to support her argument that use of the head and neck is imperative at all exertional levels, particularly that sedentary level.

Furthermore, although Plaintiff correctly points out that Dr. Bartel stated that Plaintiff "ha[d] a ruptured disc at C4-5[,]" the ALJ correctly stated that there was "no evidence [of a] recurrent disk herniation of the cervical spine."  (P.'s Br. at 12; Tr. at 16.)  No tests were cited and no other doctor's opinion or assessment supports the existence of a ruptured disc.  In light of all the evidence presented in the record, the Court finds that the ALJ fully considered the evidence pertaining to Plaintiff's neck, and therefore, supported his RFC finding with substantial evidence.

2.    <u>Legs</u>

Plaintiff contends that the ALJ failed to support his RFC determination because he did not fully consider Plaintiff's need to elevate her legs.  (P.'s Br. at 14-15.)  Plaintiff supports this contention by briefly pointing out that the ALJ did not include leg elevation in the RFC or hypothetical question.  Plaintiff also points out that the ALJ did not accept or reject Dr. Collums' opinion that Plaintiff needed to elevate her legs.

As previously noted, an ALJ's hypothetical question must reasonably incorporate all of the claimant's disabilities recognized by the ALJ, and the claimant must have the opportunity to correct any deficiencies in the hypothetical question.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  However, the ALJ only needs to incorporate into the hypothetical question limitations that the ALJ finds supported by the record.  *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

Briefly addressing the hypothetical question, the ALJ met the requirements set out in *Bowling* and *Morris* by recognizing the undisputable evidence that Plaintiff had lymphedema.  Although the ALJ did not include the limitation that Plaintiff elevate her legs in his hypothetical question or in his RFC determination, he was not required do so because such limitation was not supported by the record.

Dr. Collums stated that Plaintiff "has to elevate her legs" but did not state that he had instructed her to do so with any frequency or for a certain portion of the day.  (Tr. at 130.)  Dr. Bartel merely noted that sitting for a long time aggravated her condition that required support hose.  (Tr. at 133.)  According to the record, no other doctor specifically imposed the limitation on Plaintiff to elevate her legs.  Furthermore, Plaintiff's own testimony reveals that she can

"alleviate the swelling in her legs by standing up and moving around after sitting for a one-hour period."   (Tr. at 16, 162-63, 165.)   In conclusion, the ALJ fully considered the evidence pertaining to Plaintiff's legs, and therefore, supported his RFC finding with substantial evidence.

**D.      *Issue 1.1:  Failure to Consider Plaintiff's Subjective Complaints***

Plaintiff argues that the ALJ erred in failing to consider her subjective complaints. Despite the ALJ's finding of inconsistency between the medical records and Plaintiff's testimony, Plaintiff asserts that "the medical evidence and Plaintiff's testimony are mutually consistent and uncontradicted in showing that Plaintiff  [] had a restricted range of neck motion." (P.'s Br. at 12.)  Further, Plaintiff contends that the ALJ failed to explain his unclear reasoning why Plaintiff's daily activities consisting various household chores showed inconsistency and "detract[ed] from the credibility of her complaints[.]"  *Id*.  Particularly, Plaintiff argues that the purported inconsistency of Plaintiff's daily life activities and her lymphedema do not exist because the daily activities are standing activities while the Plaintiff must sit to relieve her legs and elevate them.  *Id*.

Because pain constitutes a disabling impairment when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment," the ALJ is required to make affirmative findings regarding a claimant's subjective complaints.  *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994.) An ALJ is not required to articulate specifically the evidence supporting a credibility finding and to discuss the evidence that was rejected.  *Id*.  However, "when the evidence clearly favors the claimant, the ALJ must articulate reasons for rejecting the claimant's subjective complaints of pain."  *Id.* "It is within the ALJ's discretion to discredit complaints of pain based on the complainant's testimony of her daily activities in combination with the medical records."

*Sanchez v. Barnhart*, 75 Fed. Appx. 268, 2003 WL 22121013, at *2 (5th Cir. Sept. 15, 2003) (citing *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991)). "Subjective complaints of pain must also be corroborated by objective medical evidence." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

The ALJ stated that he gave Plaintiff's subjective complaints "full consideration, both individually and in combination." (Tr. at 16.) However, the ALJ found the Plaintiff's testimony credible only to the extent that it was "consistent with a residual functioning capacity for a limited range of light work activity." (Tr. at 17.) Plaintiff testified that she could "take care of her own personal needs, prepare light meals, load and unload the dishwasher, make her bed, do laundry, take out small bags of trash, go grocery shopping, shop in Wal-Mart for as long as 45 minutes, [] attend church," work on a computer, and walk around the track one time. (Tr. at 16-17.) In response, the ALJ noted that even though he gave Plaintiff's subjective complaints "full consideration, both individually and in combination[,]" he found claimant's admitted daily living activities to be "inconsistent with severe, disabling pain." (Tr. at 16.) Additionally, the ALJ found that there was "no evidence the claimant has developed recurrent disk herniation of the cervical spine to support her testimony regarding severe neck pain…." (Tr. at 16.)

Applying *Falco*, the evidence does not "clearly favor[] the claimant," and therefore, the ALJ was not required to "articulate reasons for rejecting the claimant's subjective complaints." *See Falco*, 27 F.3d at 163. Under *Sanchez*, the ALJ was free to make his conclusion that Plaintiff's subjective complaints were inconsistent with her description of her daily activities and the medical record. *See Sanchez*, 75 Fed. Appx. at 268. As evident from the ALJ's findings, the ALJ fully considered the medical evidence relating to Plaintiff's neck pain and lymphedema

throughout his decision.   (Tr. at 14-17.)   For example, he recognized that Plaintiff had "degenerative disc disease of the cervical spine" (Tr. at 14) and "is afflicted with symptoms from a variety of sources, to include mild to moderate chronic pain, which are sufficiently severe as to be noticeable to her at all times."  (Tr. at 17.)

Plaintiff contends that the ALJ's conclusion of inconsistency between her subjective complaints and daily activities does not make logical sense.   However, the Court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *See Greenspan*, 38 F.3d at 236.

In conclusion, the Court finds that the ALJ was within his discretion to determine that the Plaintiff's testimony was inconsistent with her subjective complaints regarding her restricted neck motion and need to elevate her legs due to lymphedema.   Therefore, the ALJ did not fail to support his RFC finding with substantial evidence.

**E.**      ***Issue 1.2: The ALJ's misinterpretation of Plaintiff's testimony.***

Plaintiff contends that the ALJ inaccurately asserted that Plaintiff could use a computer. Plaintiff argues that the false assertion was misused to find inconsistencies in Plaintiff's testimony.   The ALJ's decision must be based on evidence actually in the record, and not mischaracterized or misstated interpretations of that evidence.  *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) ("'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"); *see also Rains v. Sec'y of Health and Human Servs.*, 731 F. Supp. 778, 780 (E.D. Tex. 1989) ("this Court finds that the ALJ frequently mischaracterized the evidence in that record, and that his conclusion is not supported by the evidence actually in the record."); *Nobles v. Sullivan*, 1992 WL 176114, at

*5 (E.D. La. July 15, 1992) (reversing for lack of substantial evidence where the ALJ misstated the VE's opinion and mischaracterized the claimant's residual functional capacity).

In this case, Plaintiff specifically stated in the hearing that she "[could not] look at a computer screen." (Tr. at 180.)  She further explained that she had to hold her head up to see the screen through her bi-focals, which in turn, would hurt her neck.  *Id.*  The ALJ clearly erred in stating that Plaintiff's testimony showed that she could use a computer. (Tr. at 16-17.)  However, the error was harmless.  Although the ALJ made this misstatement or misinterpretation, it did not provide a basis for his decision.  The jobs listed by the VE were generally not jobs in which Plaintiff would use a computer.  A stuffer, suture winder, and a final assembler of optical goods are all unskilled, sedentary jobs that would generally not require Plaintiff to use or look at a computer screen.  (*See* Tr. at 179.)  An appointment clerk may require the use of a computer, but this was not the only job that was available to Plaintiff as recommended by the VE.

In conclusion, the ALJ's statement that Plaintiff's testimony showed she could use a computer was not based on substantial evidence, but was rather based on a misstatement or misinterpretation.  However, since this finding did not affect the outcome because the jobs listed by the VE were not just jobs that required the use of a computer, this Court finds the ALJ's error to be harmless.

**F.    *Issue Two: Failure to Fulfill Heightened Duty to Fully and Fairly Develop the Record***

Plaintiff also argues that the ALJ failed to fully develop the record and that she was prejudiced by that failure.  (P.'s Br. at 15.)  Specifically, Plaintiff contends that the ALJ failed to meet a heightened duty to fully and fairly develop the record for a *pro se* plaintiff by not making

an "inquiry of Dr. Bartel to see if "evidence regarding transient ischemic attacks" [beyond Dr. Bartel's letter] existed."  (P.'s Br. at 15.)

"[T]he ALJ has a heightened duty in cases where a claimant is unrepresented by counsel 'to develop the facts fully and fairly and to probe conscientiously for all of the relevant information.'"  *Gullett v. Chater*, 973 F. Supp. 614, 620 (E.D. Tex. 1997) (quoting *Ware v. Schweiker*, 651 F.2d 408, 414 (5th Cir. 1981)).  "Where the ALJ fails to meet this duty, a court must not hesitate to remand, if an adequate showing is made that the claimant was prejudiced."  *Id.*  Thus, the Court must determine whether the ALJ satisfied his heightened duty to elicit all relevant facts and, if not, whether Plaintiff was prejudiced.  *See Brock*, 84 F.3d at 728.

    1.   <u>Developing the Record</u>

Although the ALJ has a duty to develop the record, "it is not the ALJ's duty to become the claimant's advocate."  *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993).  The claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(a) (stating that "[claimant] must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)"); and 20 C.F.R. § 416.912(c) (stating "[y]our responsibility.  You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled")).  As to the requirements to obtain supplemental information, SSR 96-2p admonishes:

> [I]n some instances, additional development required by a case—for example to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an

inconsistency between a treating source's medical opinion and the other substantial evidence in the case record…

In this case, the ALJ found that there was "no evidence regarding transient ischemic attacks to support the restrictions set forth by Dr. Bartel."[9] (Tr. at 16.)  There are only two lines in the entire medical record that address "transient ischemic attacks" or "ischemia." (Tr. at 133, 127.)  In 1997, Dr. Pogue stated that there were "[n]o ST-T wave changes consistent with ischemia." (Tr. at 127.)  Three years later, in 2000, Dr. Bartel simply stated that Plaintiff had "evidence of brain stem transient ischemic attacks" that were further aggravated by reaching overhead.  (Tr. at 133.)  Otherwise, there is no other discussion about such a condition by any other physician.

Dr. Bartel's letter failed to support his medical conclusions with any evidence.  The letter contained no indication that Dr. Bartel performed any tests or provided treatment to Plaintiff.  Nor did he state that his opinion was based on a review of treatment records provided by other physicians.   The letter contained no indication that supporting medical records or other documents even existed.  Dr. Bartel's letter was just that, a letter that did not appear to be lacking or missing any support.  *Cf. Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (finding that a treating physician's letter did support the conclusion that a claimant was disabled when it recited the history of the doctor-patient relationship, based its conclusions on past treatment, and was supported by medical records of examinations by that physician).   Additionally, there is no evidence that his letter created inconsistency between a treating source's medical opinion and

---

[9] Plaintiff does not contend that Dr. Bartel is a treating physician, but rather labels him as an "other medical source." (Pl.'s Br. at 15.)  Therefore the Court does not consider whether the ALJ failed to properly consider Dr. Bartel's opinion.

other substantial evidence in the case record.  Furthermore, there was no indication that Dr. Bartel was a treating physician or that he provided any other evidence in the record.  As noted above, it was Plaintiff's duty to furnish her medical evidence to the Commissioner.  20 C.F.R. § 416.912(a).  In this case, Plaintiff failed to offer more evidence or other supporting documents from Dr. Bartel despite ample opportunity to do so.

In addition, the Court notes that Plaintiff did not list transient ischemic attacks as a basis for her disability claim and did not mention this in the hearing.  Plaintiff had opportunities to raise this impairment and any supporting evidence before and during her hearing, but she did not. *See, e.g. Ellison*, 355 F.3d at 1276.

In conclusion, this Court finds that the ALJ fulfilled his heightened duty to fully and fairly develop the record.  Further, the ALJ sufficiently evaluated the record and Dr. Bartel's letter, and adequately provided a basis for his ultimate finding of "not disabled."

2.    Prejudice

Plaintiff asserts that she was prejudiced by the ALJ's failure to fully and fairly develop the record.  Plaintiff argues that Dr. Bartel's assessment stated that "[she] should/could not use her arms above shoulder level[,]" and that proper consideration of this limitation would have altered the finding of the ALJ from not disabled to disabled.  (P.'s Br. at 16-17.)

Even if the Court found that the ALJ did not fully develop the record, Plaintiff must show that she was prejudiced by it.  *See Brock*, 84 F.3d at 728.  Failure to develop an adequate record is not *per se* grounds for reversal.  *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984). Plaintiff must show that she "could and would have adduced evidence that might have altered the result."  *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000); *see also Blevins v. Apfel*, 1998 WL

279394, *2 (9th Cir. May 22, 1998) (holding that when a claimant offered no rebuttal evidence but merely claimed that another examination could lead to a different conclusion, the court could not find that the consultative examination provided insufficient support for the ALJ's findings).

Plaintiff failed to show that requesting more records from Dr. Bartel "could and would have adduced evidence that might have altered the result" as laid out by the Fifth Circuit. *See, e.g. Carey*, 230 F.3d at 142. Upon close reading of Dr. Bartel's letter, Dr. Bartel actually states that transient ischemic attacks are "aggravated by use of the arms above shoulder level." (Tr. at 133.) Dr. Bartel does not say that Plaintiff cannot or should not use her arms above shoulder level. Even if Dr. Bartel intended to say the Plaintiff should not use her hands above shoulder level, "working above shoulder level" or "use of the arms above shoulder level" does not equate to "reaching," as that term is used in the <u>Dictionary of Occupational Titles</u> (<u>DOT</u>). There is no evidence in the record to suggest that Plaintiff could not do jobs that required reaching in general. Therefore, as evidenced through the record, Plaintiff could perform jobs that required frequent reaching as required by the <u>DOT</u>.

In addition to finding that the ALJ fully and fairly developed the record, Plaintiff's assertions of prejudice are merely speculations without valid support. Even if Plaintiff could prove that the ALJ failed to fully and fairly develop the record regarding transient ischemic attacks, Plaintiff has not proven prejudice.

**G.     *Issue Three: Failure to Give a Treating Source's Opinion Controlling Weight.***

Plaintiff asserts that the ALJ failed to give controlling weight to the opinion of her treating physician, Dr. Collum, that she was disabled. (P.'s Br. at 17.) Particularly, Plaintiff argues that the ALJ should have applied the factors listed in 20 C.F.R. § 404.1527(d)(2) (2003)

in determining that Dr. Collums' opinion would be credible only to the extent it was consistent with the RFC.  (P.'s Br. at 17.)

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with...other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). However, if good cause exists, an ALJ may give a treating physician's opinions little or no weight.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id*. at 456.  Thus, "[t]he treating physician's opinions are not conclusive."  *Id*. at 455.  "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has the sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.2d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Martinez*, 64 F.2d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The Fifth Circuit in *Newton* held that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20. C.F.R. § 404.1527(d)(2)."  Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the

physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Newton*, 209 F.3d at 456 (citing 20 C.F.R. § 1527(d)(2)). However the court expressly excluded from the scope of *Newton* those cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

An ALJ is not required to consider the six factors when rejecting a doctor's conclusion that a plaintiff is "disabled" or "unable to work," which are determinations that "have no special significance." *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (citing 20 C.F.R. § 404.1527(e) (2000)). "These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." *Id.* In *Frank*, the doctor noted that the plaintiff was unable to work because of cervical and lumbar problems resulting from plaintiff's degenerative disc disease condition. *Id.* The ALJ denied disability benefits and the plaintiff appealed. *Id.* at 619.

The Fifth Circuit held that the doctor's opinion that plaintiff was unable to work was not a medical opinion within the meaning of the regulation, so the ALJ was not required to consider the six factors laid out in Newton.  *Frank*, 326 F.3d at 620.

In the present case, the ALJ considered Dr. Collum's medical opinion and found it credible to the extent that it was "consistent with the residual functioning capacity set forth" which includes "no walking for more than 1 hour at one time and no sitting for more than 2 hours at a time."  (Tr. at 16.)  However, contrary to Dr. Collums' conclusion that Plaintiff was "totally disabled" (Tr. at 130), the ALJ found that Plaintiff was not disabled.  Because the ALJ had the sole responsibility to determine disability status, the ALJ was within his discretion to find that Plaintiff was not disabled.  *See Martinez*, 64 F.2d at 176; 20 C.F.R. § 1527(e)(1) (2000).  Further, applying *Frank*, Dr. Collums' statement that Plaintiff was "disabled" or "unable to work" had no "special significance" and was merely a legal conclusion that should be reserved to the ALJ to decide.  *See Frank*, 326 F.3d at 620.  Furthermore, since the ALJ rejected Dr. Collums' conclusion that Plaintiff was "disabled[,]" the ALJ was not required to consider the six factors in 20 C.F.R. § 404.1527(d)(2).  (P.'s Br. at 17.)  In contrast to *Contreras*, this was not a limited circumstance where the ALJ "summarily reject[ed] the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant."  *See Contreras*, 2001 WL 520815, at *4.  Thus, *Newton* and the application of the six factors does not apply to the case at bar.

In conclusion, the Court finds that the ALJ properly considered Dr. Collums' opinion and gave it the controlling weight that he should have; thus he did not have to explain further, or

apply the factors in 20 C.F.R. § 404.1527(d)(2), to determine not to give weight to Dr. Collums'

conclusory opinion that Plaintiff was disabled.

### III.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** that the decision of the Commissioner be

**AFFIRMED.**

**SO ORDERED**, on this 30th day of June, 2005.


**IRMA CARRILLO RAMIREZ**
**UNITED STATES MAGISTRATE JUDGE**